LYDIA R. KRAKER, Appellant, v FREDERICK ROLL et al., Respondents, and ANNA ROLL, Appellant, et al., Defendants.

Second Department, April 2, 1984

APPEARANCES OF COUNSEL

*Thomas T. Kilhenny* and *Mellor A. Gill* for Lydia Roll Kraker, appellant.

*Richard S. Zummo* (relying on the brief of appellant Lydia Roll Kraker), for Anna Roll, appellant.

*Cruser, Hills, Hills & Besunder* (*Edgar Hills* of counsel), for Squirrel Hill Homes, Inc., respondent.

OPINION OF THE COURT

GIBBONS, J.

Frederick Roll, Sr., was born in 1879. In 1929, he purchased an unimproved parcel of real property in Brentwood, Suffolk County. Subsequently, in 1933, he purchased a contiguous parcel of the same size. Each parcel was made up of two lots. Mr. Roll died, intestate, on April 4, 1963, leaving three children: a son, Frederick Roll, Jr., born August 20, 1911, and two daughters, Lydia Kraker, formerly Lydia Roll, and Anna Roll. His wife had predeceased him. The trial record does not reveal whether an administrator was appointed. In any event, Frederick Roll, Sr., remained the record owner of the two parcels after his death.

During the 1930's a house was built on the parcel which had been purchased in 1929 (hereinafter the 1929 property). Mr. Roll and two of his children, Anna and Frederick Roll, Jr., moved into the house in or about 1945. The other daughter, Lydia, who had married Leopold Kraker in 1937, did not live in the house, although she and her husband frequently visited. Frederick Roll, Jr. (hereinafter Fred), and Anna remained in the house after their father died and, at least to the date of trial, continued to live there.

On May 26, 1976, Fred conveyed the parcel which had been purchased in 1933 (hereinafter the 1933 parcel) to Squirrel Hill Homes, Inc. (hereinafter Squirrel Hill), for $19,000. Thereafter, by summons and complaint dated June 14, 1977, plaintiff Lydia Roll Kraker commenced this

suit against her siblings and against Squirrel Hill. Also named as defendants are the State of New York and the United States of America. According to the complaint, the action was "brought pursuant to Article 15 of the Real Property Actions and Proceedings Law * * * to compel the determination of claims" to the 1929 and 1933 parcels. No request was made for damages.

In his answer, Fred claimed that he, and not his father, was the "Frederick Roll" who purchased the two parcels in 1929 and 1933. In its amended answer, Squirrel Hill made the same claim. In addition, Fred and Squirrel Hill set forth the following affirmative defenses: (1) that Fred's ownership of the property or properties in question was acquired by adverse possession; (2) that the action was barred by the applicable Statute of Limitations; and (3) that the plaintiff was barred by laches from bringing the action. Fred also made two counterclaims. The first asked that if it be determined that Fred "was not in actual title" to the properties, then he be granted an "Equitable Trust * * * respecting both parcels of real estate". The second counterclaim stated that if it be determined that Fred "was neither in actual or equitable title to the real estate", then he was entitled to be reimbursed with $20,000, constituting one third of the moneys spent by him on the properties for improvements, taxes and the like. Defendant Squirrel Hill counterclaimed for a determination that it was the owner of the 1933 property. Squirrel Hill also alleged a cross claim against Fred "for any amount found to be due and owing by SQUIRREL HILL HOMES, INC. to the plaintiff".

Defendant Anna Roll appeared through a duly appointed guardian ad litem. She became, in effect, a coplaintiff with the service of a cross claim against defendants Fred and Squirrel Hill, requesting a determination that she "is vested with an absolute and unencumbered, undivided one-third (⅓) interest in and to [both] said premises". The record does not reveal any appearances on behalf of the United States or the State of New York; apparently, neither had an interest in the properties at issue.

The case came on to be tried without a jury. At the conclusion of plaintiff's case, defendants Fred and Squirrel Hill moved to dismiss the complaint. In an order dated

January 31, 1980, the trial court denied the motion and, instead, struck from Fred's and Squirrel Hill's answers the affirmative defenses of adverse possession and the Statute of Limitations. In its decision, the court explained that the date of Frederick Roll, Sr.'s death on April 4, 1963 was the commencement date for plaintiff's claimed ownership and the alleged adverse possession by Fred. Since that date was prior to September 1, 1963, the effective date of the CPLR (see L 1962, ch 308), the court concluded that the 15-year period prescribed by section 34 of the former Civil Practice Act was applicable, rather than the 10-year period of CPLR 212 (subd [a]) and RPAPL article 5. Therefore, since the suit was commenced on or about June 14, 1977, the court held that it was timely.

On May 15, 1980, prior to the presentation of witnesses for defendants Fred and Squirrel Hill, the attorney for Fred put the following stipulation on the record:

"Your Honor, the parties are prepared to stipulate that $46,000 has been expended by a party — let me withdraw that — by someone who, buy [sic] this property in question, to pay the taxes upon the property in question, to heat it, to provide electricity, to provide necessary insurance, to provide necessary gas and oil, to make improvements, and to build the premises, a total, your Honor, of $46,000. It is the position of my client, and we will offer proof to that effect, that he paid every penny of that.

"THE COURT: And is that $46,000 from 1929 to date or —

"MR. MANDELBAUM [Fred's attorney]: It is, your Honor".

In its decision after trial, dated September 15, 1980, the trial court found that the "Frederick Roll" named on the 1929 and 1933 deeds for the property in question was the father, not the son. The court, exercising its discretion under CPLR 103 (subd [c]), deemed the action as one to recover real property, brought under RPAPL article 6 as well as under RPAPL article 15. The court opined that whereas the action, being grounded on a statutory right, was properly an action at law, the requested relief sounded in equity. Therefore, the doctrine of laches was applicable. However, that defense was not available to Fred because, as to the 1929 property, "there has been no detrimental change in the son's [Fred's] position", and "[w]ith respect to

the parcel sold to Squirrel, the son, having wrongfully disposed of property not fully owned by him may not assert the equitable defense of laches". On the other hand, the trial court held that laches provided a viable defense for Squirrel Hill, for the following reasons: "Squirrel was a good faith bona fide purchaser who paid fair and reasonable value for the parcel it purchased and relied on what appeared to be good title. Thus, with respect to Squirrel, plaintiff's delay in bringing this lawsuit or otherwise protesting her brother's claim to the property must be weighed against the intervening rights and interests of Squirrel * * * To disturb Squirrel's title in favor of plaintiff who sat silent for fourteen years would be manifestly unjust and inequitable".

The trial court, in its decision, interpreted the stipulation recited into the record as meaning that "the parties agreed that the son expended $46,000.00, on the premises and received no contributions from his sisters". The court went on to conclude that, among other things: (1) when the father died, title to the two parcels devolved to his three children; (2) because of plaintiff's laches, Squirrel Hill received a valid and unencumbered title to the 1933 parcel; (3) in the event a partition action were to be instituted for the 1929 property, $19,000 should be added to the value of that parcel, representing the sale price of the 1933 parcel to Squirrel Hill; and (4) also in the event of a partition of the 1929 property, Fred would be "entitled to $46,000.00 [the stipulated value of his improvements], from the total value of the unsold parcel prior to its partition into three equal parts".

After the decision, a controversy emerged between the parties as to the respective proposed judgments submitted to the court. In particular, there was disagreement about the meaning of the stipulation. Plaintiff's attorney, in an affirmation dated December 2, 1980, argued that the sum of $46,000 included within it expenditures for such items as gas, insurance and improvements. He stated that only $15,000, and not $46,000 had been spent on improvements. He further maintained that "[t]he intent of the parties at that time was not to give credit of $46,000 to the defendant Frederick Roll, but to stipulate that he had expended that sum in connection with the property since 1963".

The trial court disagreed with plaintiff's view of the stipulation. It held that the only amounts that could be deducted from the $46,000 were the 1929 and 1933 purchase prices of the two parcels (which Trial Term found to be $570 per parcel). Therefore, it was concluded by the court that Fred was entitled to a credit of $44,860. The judgment appealed from gives Fred a credit in that amount, to be utilized in the event of a partition of the 1929 property.

All three siblings filed notices of appeal. Plaintiff has perfected her appeal, and Anna, whose notice of appeal essentially duplicated that of plaintiff's, has indicated, through her guardian ad litem, that she accepts plaintiff's arguments on appeal as her own. Fred has not perfected his cross appeal. Plaintiff's contentions on appeal are that (1) laches has no application and even if it does, plaintiff is not guilty of it, and (2) Fred is not entitled to a credit to be deducted from the total value of the unsold parcel in the event of partition. The first contention essentially concerns the status of the 1933 property, and the second affects the 1929 property. We will discuss both in turn.

I

As noted above, while all three siblings filed notices of appeal, Fred has not perfected his cross appeal. We, therefore, take as established the trial court's conclusion, which is amply supported by the record, that the grantee of the 1929 and 1933 conveyances was Frederick Roll, Sr., and not the son.

When Frederick Roll, Sr., died intestate in 1963, title to both parcels automatically vested in his distributees, the three offspring, as tenants in common (*Waxson Realty Corp. v Rothschild,* 255 NY 332; *Matter of Clark,* 69 Misc 2d 498, 499; former Decedent Estate Law, § 83; see Hoffman, Practice Commentary, McKinney's Cons Laws of NY, Book 17B, EPTL 13-1.3, pp 383-384). This vesting by descent occurred by operation of law, irrespective of the apparent failure to appoint an administrator or to file new deeds (see *Singer v Levine,* 15 Misc 2d 785; see, generally, 14 [rev vol] NY Jur, Decedents' Estates, §§ 2, 24, 25).

To determine the respective interests of the parties in the 1933 parcel, it is first necessary to consider the nature of the transaction between Fred and Squirrel Hill. We are of the view that the signing of the deed to Squirrel Hill by Fred was one of those unusual instances where a person commits forgery by signing his own name (see *People v Levitan,* 49 NY2d 87, 90; *People v Briggins,* 50 NY2d 302, 306-307). For there to be a forgery, "it is necessary that the actual maker or drawer be someone other than the ostensible maker or drawer" (*People v Levitan, supra,* p 91). The ostensible maker in the so-called sale to Squirrel Hill was the Frederick Roll whose name appeared on the 1933 deed, i.e., the father. The actual maker was the son. Since Fred pretended to be the Frederick Roll named on the 1933 deed, but was not that person, he committed a forgery (III American Law of Property, § 12.58, p 303; see 4 Wharton, Criminal Law [14th ed], § 499, p 123; Perkins, Criminal Law [2d ed], p 347). It is of no account that the Frederick Roll named in the 1933 deed was dead (3 Underhill, Criminal Evidence [5th ed], § 778).

In *People v Levitan (supra,* p 90), the Court of Appeals referred to *People's Trust Co. v Smith* (215 NY 488) as an example of a case where a forgery existed despite the fact that the signer used his own name. *People's Trust Co. v Smith (supra)* involved a situation where the nephew of a mortgagee, having the same name as the mortgagee, was entrusted with the mortgage instrument. Pretending to be the person named on the instrument, the nephew assigned it as collateral for a debt. Judge Cardozo, writing for a unanimous Bench, labeled this act a forgery and the court held that the title of the uncle never divested (*People's Trust Co. v Smith, supra,* pp 491, 495). Likewise, we find that Fred's signature in the transaction with Squirrel Hill was a forgery.

It is, of course, true that a forged deed is void (*Marden v Dorthy,* 160 NY 39; *Kearns v Manufacturers Hanover Trust Co.,* 51 Misc 2d 34, 39; 2A Warren's Weed, NY Real Property [4th ed], Forgery, § 1.04; 15 [rev vol] NY Jur, Deeds, § 59). Thus, Squirrel Hill cannot simply claim it was a bona fide purchaser, which might provide a viable defense if this were simply a case of fraud, and the deed

were voidable and not void (see *Anderson v Blood,* 152 NY 285; Real Property Law, § 266; 26 CJS, Deeds, § 68, subd a; 2A Warren's Weed, NY Real Property [4th ed], Fraud, § 2.01). Nonetheless, in the unique circumstances of this case, the fact that Fred committed a forgery does not necessarily mean that Squirrel Hill purchased nothing. A deed can be valid in part and invalid in part, as, for example, where one cotenant signs his own name but forges the names of his cotenants (26 CJS, Deeds, § 68, subd c; see *Thurmond v McGrath,* 70 Misc 2d 849). Furthermore, property law has long recognized a doctrine known as "title by estoppel" (III American Law of Property, § 15.17). One component of that doctrine is "estoppel by deed", which is defined as "the estoppel or bar which precludes a party from denying the truth of his deed" (III American Law of Property, § 15.18, p 841; see 21 NY Jur, Estoppel, § 4). By this doctrine and because of the forgery, Fred and those in privity with him are precluded forever from questioning the validity of the transfer of Fred's interest in the 1933 property to Squirrel Hill.

What of plaintiff's interest in the property? Estoppel by deed, which is technical in nature and different from equitable estoppel or estoppel *in pais,* is operative only to the parties to a deed and their privies (21 NY Jur, Estoppel, §§ 4, 7; III American Law of Property, § 15.18). Since plaintiff did not participate in the 1976 transaction, estoppel by deed has no application to her. Furthermore, Fred could not transfer plaintiff's interest unless he became the owner of that interest sometime after its vesting upon the father's death in 1963 and before the 1976 transaction with Squirrel Hill. As held by the trial court, Fred did not obtain plaintiff's interest through adverse possession because the applicable 15-year period had not passed (see *Carrington v McNeil,* 58 AD2d 719). Laches has no application to Fred's ownership because, as held by the trial court, Fred was not prejudiced in any way and he has unclean hands. Title to plaintiff's interest by way of a constructive trust, which apparently is the gist of Fred's first counterclaim, has not been shown or even adequately pleaded (see *Sharp v Kosmalski,* 40 NY2d 119; *Singer v Levine,* 15 Misc 2d 785, *supra*). The conclusion is inescapable that Fred never

obtained plaintiff's interest. Therefore, unless plaintiff has herself done something for which equity will prevent her from contesting the sale of the 1933 property to Squirrel Hill, plaintiff's one-third interest in the property has not divested.

The trial court quite properly deemed this action to be for ejectment, brought under RPAPL article 6 (CPLR 103, subd [c]). An ejectment action is an action at law, and requests for other relief which appear equitable in nature, such as a declaration that other titles are void, are merely incidental (*Miceli v Riley,* 79 AD2d 165, 169, n 2). "Nevertheless, it has long been held that a defendant in such an action may raise equitable defenses. (See, e.g., *Crary v Goodman,* 12 NY 266.) It appears, however, that in each case in which the court has chosen to fashion an equitable remedy rather than to award the plaintiff unconditional possession of the property, there has been a finding that the plaintiff himself had engaged in some inequitable conduct or had failed to act appropriately when he knew, or should have known, that something was amiss with respect to his property rights" (*Miceli v Riley, supra,* p 169).

The trial court applied the equitable doctrine of laches in holding that plaintiff could not "disturb Squirrel's title". The question is not whether Squirrel's title should be disturbed, since a forged deed generally cannot pass title. Rather, the question is whether plaintiff's conduct was such that she has forfeited her right to claim an interest in the property (21 NY Jur, Estoppel, § 18). The trial court made no findings in this regard. It only remarked on a delay in bringing suit. However, it has long been held with respect to real property, that "no period of inaction merely has been held sufficient to justify a nuisance or trespass, unless it has continued for such a length of time as will authorize the presumption of a grant [by adverse possession]" (*Galway v Metropolitan El. Ry. Co.,* 128 NY 132, 153). A necessary ingredient for an equitable interference in plaintiff's cotenancy is that she has improperly acted, or failed to act, to the detriment of Squirrel Hill. Specifically, in this case where laches is the equitable defense, it must be shown that plaintiff inexcusably failed to act when she knew, or should have known, that there was a problem

with her title to the property (*Miceli v Riley, supra,* p 169; *Orange & Rockland Utilities v Philwold Estates,* 70 AD2d 338, 343, mod on other grounds 52 NY2d 253). In other words, for there to be laches, there must be present elements "to create an equitable estoppel" (*Weiss v Mayflower Doughnut Corp.,* 1 NY2d 310, 318).

While equity may play a role in an ejectment action, the question remains as to what role is appropriate. The Court of Appeals has recently reiterated the rule that equitable estoppel "should be applied with great caution when dealing with realty" (*Huggins v Castle Estates,* 36 NY2d 427, 433). There may be instances, for example, where, while the true owner will be entitled to the return of his property, his own inequitable conduct will be such that the defendant will be entitled to recover the value of improvements made in good faith, over and above the offset allowed by RPAPL 601 (*Joanes v Boyle,* 275 App Div 952; *Roller v Frankel,* 9 AD2d 24; cf. *Miceli v Riley,* 79 AD2d 165, 170, *supra*). However, where title by adverse possession has not been made out, the true owner's inequitable conduct must essentially amount to a fraud to result in a deprivation of legal title. "[T]here must be shown * * * either actual fraud, or fault or negligence, equivalent to fraud on his part, in concealing his title, or that he was silent when the circumstances would impel an honest man to speak; or such actual intervention on his part * * * as to render it just that as between him and the party acting upon his suggestion, he should bear the loss" (*Trenton Banking Co. v Duncan,* 86 NY 221, 230).

Exercising our authority to review questions of fact (CPLR 5501, subd [c]), we now turn to the issue of whether the above principles applied to the facts of the instant case, make out a defense of laches. There is no evidence in the record that plaintiff knew, or should have known, prior to the 1976 sale to Squirrel Hill, that Fred claimed sole ownership of the property. Plaintiff categorically denied that Fred ever told her of his claim. She did testify that, shortly after her father's death, she, her husband, Fred and Anna had a conversation, at which time Fred informed them that there was no will. Plaintiff's husband then declared that the property "will be divided between the

three of us", meaning apparently, between the three siblings. Plaintiff testified that Fred did not respond to this assertion. This silence on Fred's part can hardly be termed a disavowal of the comment made by plaintiff's husband. We do not know if Fred even heard plaintiff's husband, but if he did, his silence could have been intended and interpreted as a sign of agreement.

In actual fact, it is not apparent when Fred decided to assert sole ownership. It may not have been until he contracted to sell the 1933 parcel to Squirrel Hill. The fact that plaintiff admittedly paid none of the expenses of the property neither shows that Fred claimed that he owned the property outright, nor that plaintiff should have been aware that something was wrong. Plaintiff lived elsewhere. It is perfectly reasonable to expect that a cotenant who is actually receiving the benefit of living on a property should be the one who foots the bill for reasonable expenditures associated with the property.

Plaintiff and her siblings were tenants in common of the 1933 property. There is a presumption that a tenant in common in possession of the property holds the property for the benefit of all the tenants in common and acts in conformity with their rights (RPAPL 541). While the presumption, of course, may be rebutted and adverse possession shown (see, e.g., *Tarbox v Hulett,* 272 App Div 633), the existence of the presumption bespeaks of the feeling that a cotenant need not worry just because his fellow cotenant is in possession of the property. As Judge Cardozo said in *People's Trust Co. v Smith* (215 NY 488, 492, *supra*), "[f]aith in the honesty of trusted friends and relatives is seldom negligence". Possession by one cotenant only becomes adverse "on unmistakable repudiation of the owner's right by the possessor and notice thereof to the owner" (III American Law of Property, § 15.7, p 798). Such a repudiation may exist absent vocal or written expression, but only by dint of "unequivocal acts, so open and public, that notice may be presumed of the assault upon his title, and the invasion of his rights" (*Culver v Rhodes,* 87 NY 348, 353). Thus, adverse possession does exist when one cotenant purports to sell the entire estate (*Sweetland v Buell,* 164 NY 541). Looking at the record with these

principles in mind, it must be concluded that there was no repudiation of plaintiff's title or adverse possession until the sale of the 1933 property to Squirrel Hill. Plaintiff brought suit some one year after that event. It cannot be said that this was an unreasonable or inexcusable delay. Nor can it be said on this record that, prior to the sale to Squirrel Hill, plaintiff knew or should have known that Fred claimed sole ownership, so as to make it incumbent on her to speak out, not only to protect her rights but to protect potential buyers of the property.

It should now be evident that if plaintiff is guilty of laches, her guilt is solely predicated on the fact that she apparently did not take steps to insure, after her father's death, that deeds with her name on them were filed with the county clerk. However, such constitutes mere inaction and not laches. It certainly does not constitute inequitable conduct amounting to a fraud inducing Squirrel Hill to take title from Fred. In any event, it was unnecessary, in order to perfect title, to record a deed conveying the property to plaintiff, inasmuch as she became a one-third owner by operation of law. As the Court of Appeals has stated, "[w]e are not prepared to say, and we have no right to say, in the absence of any finding of fraud, or proof of circumstances necessarily tending to the conclusion of fraud, that the omission by the defendant to record his deeds, prevents him from asserting, as against the plaintiff, his legal title to the land" (*Trenton Banking Co. v Duncan,* 86 NY 221, 231, *supra*).

The bottom line is that plaintiff has not been divested of her one-third interest in the 1933 property. While we can certainly sympathize with the plight of Squirrel Hill, since it is apparently the victim of a fraudulent scheme, the solution does not lie in penalizing an innocent titleholder. As Justice Titone stated in a similar context, inappropriately using equity to divest a distributee of her property "ignore[s] * * * the rights of heirs and distributees and the basic laws of real property" (*Thurmond v McGrath,* 70 Misc 2d 849, 851, *supra*). We can only conclude in this case that plaintiff remains a one-third cotenant in the 1933 property. For recompense, Squirrel Hill must look to its title company and/or the source of the trouble, Fred.

## II

We now turn our attention to the 1929 property and that portion of the judgment which allows Fred a credit of $44,860 in the event that parcel is partitioned into three parts. It should be recalled that this provision hinges on the trial court's interpretation of a stipulation placed on the record by Fred's attorney. The stipulation was that "someone" expended $46,000 on both parcels from 1929 to the date of the stipulation.

On appeal, plaintiff maintains that the stipulation was not intended to mean that $46,000, less the initial cost of the land, would be given as a credit to Fred, to be deducted from the value of the 1929 property upon its partition. In support of her view, plaintiff refers to the rule in ejectment cases that, where no claim is made by the plaintiff for damages, generally no allowance can be granted a defendant for improvements (see *Miceli v Riley,* 79 AD2d 165, 170, *supra).* She also argues that any improvements made by Fred occurred prior to his adverse possession, and so, under RPAPL 601, Fred is not entitled to reimbursement.

■ The fallacy in plaintiff's argument is that, irrespective of whether it can be said that normally a defendant in Fred's position would not be entitled to reimbursement for improvements (see *Cosgriff v Foss,* 152 NY 104), with a stipulation parties can chart their own course, if that course is not unreasonable, or against good morals or public policy (see, generally, *Nishman v De Marco,* 76 AD2d 360, 367-371). There is nothing inherently offensive about parties to an ejectment action stipulating to a credit for expenditures, even though, without the stipulation, the defendant might not be entitled to compensation.

"A stipulation is a contract between parties, and as such is governed by general principles for its interpretation and effect" (*Nishman v De Marco, supra,* p 366). Our task, as in an interpretation of any contract, is to determine the intent and purpose of the stipulation (*Matter of O'Brien v Assessor of Town of Mamaroneck,* 20 NY2d 587, 594; Note, Judicial Admissions, 64 Col L Rev 1121, 1132). To glean intent, the record will be examined as a whole (*Matter of Way v Town of Poughkeepsie,* 75 AD2d 602, 604).

The initial statement of the stipulation that "someone" expended $46,000 is so ambiguous as to be almost meaningless. Who expended that amount? Was it more than one person? And why is the stipulation being made in the first place? To what issue in the case is it relevant: to laches, adverse possession, Fred's counterclaim for $20,000, or what?

Later on in the trial, some clarity was added when plaintiff's attorney stated that he did agree that all expenditures with respect to the property since 1963 were met by Fred. However, he did not say that he was willing to stipulate that all expenses from 1929 to 1963 were paid by Fred. To the contrary, plaintiff presented evidence that her father built the house, with help from her husband Leopold and Fred, and that her father paid the expenses.

As already mentioned, after trial one of the plaintiff's lawyers submitted an affirmation stating that the $46,000 figure was not just for improvements, but for other expenses as well. The affirmation further stated that only $15,000 had been for improvements and Fred's credit should be limited to that amount.

Analyzing the stipulation by examining its initial statement and the subsequent remarks concerning it, it is clear that the parties did agree that Fred was entitled to a credit. Thus, plaintiff's belated argument on appeal that Fred is not entitled to some reimbursement is without merit. Fred's entitlement exists by stipulation. However, it is not at all clear in what amount the credit should be and whether it should only represent expenses for improvements, as opposed to expenses for taxes, utilities and the like. While plaintiff's attorney conceded in his affirmation that Fred should be compensated for improvements made since 1963, the $15,000 figure that he mentioned is not supported by the trial record. Furthermore, there is nothing before us which would aid in determining whether the parties intended that the credit include reimbursement for such items as taxes, insurance, utility expenses, and so on.

Further confusion is created by the fact that Fred only counterclaimed for $20,000. We have found nothing in the record suggesting that this *ad damnum* clause was amended so as to allow for a $46,000 counterclaim. It will

also be recalled that Anna brought a cross claim against Fred. The original papers do not show that Fred, in turn, cross-claimed against Anna to be reimbursed for expenses. Yet, we are asked to find that Anna, through her guardian ad litem, stipulated to an approximately $46,000 credit to be deducted from the value of the 1929 property upon its partition on behalf of Anna, Fred and Lydia. This we will not do, absent a clearer statement of intent than is found in this record.

When a court analyzes a stipulation which has more than one possible meaning, and where one or more of the possible interpretations will result in a consequence which the proof might not sustain and which seems unusual in the circumstances of the case, the court should be careful not to apply the broader interpretation absent a clear manifestation of intent (*Matter of O'Brien v Assessor of Town of Mamaroneck*, 20 NY2d 587, 594, *supra*). In this case it cannot be said with any degree of certainty that the parties intended a credit for Fred in the full amount of $46,000. We, therefore, construe the stipulation as providing, more narrowly, that Fred is entitled to a credit in an amount still to be decided (see *Matter of Way v Town of Poughkeepsie*, 75 AD2d 602, *supra*). We can safely assume that, of the various categories of expenses, the parties expected improvements to be considered, since plaintiff's attorney, in his affirmation, admitted as much. Further, the stipulation explicitly provides that the measuring period should be "1929 to date", i.e., of the date of the stipulation, May 15, 1980. However, we cannot say that the term "improvements", as used by the parties in their stipulation, was intended to include the cost of building the house, which was built in the 1930's. While the law would normally consider erection of a house an improvement (see, e.g., Lien Law, § 2, subd 4), in this case, it appears that less substantial alterations to the properties were envisioned. Thus, when Fred's attorney recited the stipulation into the record, he referred to the cost "to make improvements" as separate and distinct from the cost "to build the premises". Further, plaintiff went to some pains to prove that her father was the person who was primarily responsible for building the house, with the assistance of her husband and

Fred. On this record, it can only be concluded that the parties agreed that Fred would be entitled to reimbursement for all improvements to the properties made between 1929 and the date of the stipulation, not including the cost of the initial construction of the house. More than this cannot be said.

In our view, this action does not present the best forum to resolve an accounting between cotenants. Fred's counterclaim for $20,000 should be dismissed without prejudice, to be asserted again, if he deems it advisable, in the context of a partition action with respect to the 1929 property (RPAPL 943, 945; see *Worthing v Cossar,* 93 AD2d 515). The stipulation entered in this case, as construed by this court, presents the guidelines or framework for such an accounting. If there is a partition action and Fred does assert rights to an offset, he will bear the burden not only of showing the amount he spent on improvements and that he is entitled to reimbursement for other types of expenditures, but also the amounts thereof (*Johnson v Depew,* 33 AD2d 645).

### CONCLUSION

■ In sum, we find that plaintiff's one-third interest in the 1933 property never divested. Laches has no application, so as to prevent her from asserting her title, because there is insufficient evidence of the requisite wrongdoing on her part to support such a defense.

■ We construe the trial stipulation made between the parties as meaning that Fred is entitled to a credit for improvements. However, the amount is still to be decided. A determination of that amount and resolution of the question of whether Fred is entitled to compensation for other types of expenditures must await a partition action with respect to the 1929 property, if such an action is brought.

Finally, we remark again on the fact that Anna appealed from the same portions of the judgment as the plaintiff. The record is bereft of any evidence which would even colorably show that Anna is guilty of laches or that somehow her one-third interest in the 1933 property ever passed to Fred or to Squirrel Hill. The trial court applied the

doctrine of laches to Anna without making any findings as to her specific responsibility; reference was only made to the plaintiff. We conclude that, like the plaintiff, Anna was and is a one-third owner of the 1933 property. Of course, our disposition as to the stipulation applies to Anna as well.

The provision made by Trial Term to the effect that $19,000, representing the sale price of the 1933 property to Squirrel Hill, should be added to the value of the 1929 parcel in the event of partition, should be deleted. Since Anna and Lydia have not been divested of their interest in the 1933 property, they should not share in the proceeds of their brother's transaction with Squirrel Hill. On the other hand, their interest in the properties will not be adversely affected by reason of that transaction. Squirrel Hill may seek any recourse against Fred that it may deem appropriate.

Accordingly, the judgment should be reversed insofar as appealed from, with costs.

LAZER, J. P., THOMPSON and WEINSTEIN, JJ., concur.

Judgment of the Supreme Court, Suffolk County, entered February 23, 1981, reversed insofar as appealed from, on the law and the facts, with costs to plaintiff-appellant payable by respondents, the fourth, fifth, sixth, seventh and eighth decretal paragraphs are deleted, and the following provisions are substituted therefor: (1) a provision dismissing the defense of laches interposed by defendant Squirrel Hill Homes, Inc.; (2) a provision declaring that plaintiff and defendant Anna Roll are each one-third cotenants with Squirrel Hill Homes, Inc., in certain real property purchased by plaintiff's father in 1933; (3) a provision declaring that the conveyance of that property to defendant Squirrel Hill Homes, Inc., was effective to the extent that defendant Frederick Roll and his heirs, distributees, and those in privity with him may not contest the validity of the sale of his one-third interest in the property to Squirrel Hill Homes, Inc.; and (4) a provision declaring that, in the event a partition action is hereafter instituted with respect to other real property purchased by plaintiff's

father in 1929, the defendant Frederick Roll's rights to a credit for improvements shall be governed by the stipulation entered into in the instant action.